## Chambers v. Mullins.

March 17, 1939.

J. L. HARRINGTON and C. F. PACE for appellant.

FRED MEADE and JOHN W. WHEELER for appellee.

OPINION OF THE COURT BY JUDGE FULTON—Reversing.

Appellee, Stella Johnson Mullins, a woman 39 years of age, is a hunchback and lives in Hager Hill, a village about five miles from Paintsville in Johnson County. R. C. Mullins, her husband, drifted into the community in the year 1933 and the gossip of the community, as established in evidence, shows that he probably married appellee with the intent to provide himself with a good home in expectation of her inheritance of property from her father. Some time after they married, a friend of his, Bob Conley, together with his wife, defendants in this action, came to live with appellee and her husband, Mullins, and continued to reside there during the events leading up to this litigation.

Appellant, G. C. Chambers, resided in a small house owned by appellee in Hager Hill, located just a short piece from appellee's home, paying her $6 a month rent for the property. Appellee and her husband executed a deed for this property to Conley on June 13, 1934, and

on July 19, 1934, Conley conveyed the property to Chambers, the deed reciting a consideration of $600, of which $300 was cash and the balance evidenced by a lien note.

In this action filed March 26, 1935, appellee sought a cancellation of the deeds executed by her to Conley and by Conley to Chambers, her action being based on mental incapacity, which she alleges was known both to Conley and Chambers, and also on a conspiracy alleged to have existed between Chambers, Conley and her husband to procure the execution of the deed to Conley by administering high-powered narcotic medicines to her, by threatening her life with a high-powered rifle and by threats to send her to the penitentiary on account of interference with the United States mail by holding up a letter. A large amount of proof was taken and the court adjudged a cancellation of the deeds and from this judgment the appeal is prosecuted by appellant.

Numerous witnesses testified that appellee was incapable of making a deed. No one of these witnesses testified to any fact or any reason showing her incapacity. On the contrary, the testimony of all these witnesses introduced by appellee shows that, as far as intelligence is concerned, she ranks with about the ordinary and average person in that community. Dr. P. B. Hall, the only medical witness who testifies, says that she is not an educated person, nor is she an insane or feeble-minded person. The full effect of his testimony may be summed up in the statement made by him, "I doubt whether she has the average mentality of the ordinary person of her age." Considering all the testimony on this issue, it is perfectly apparent that, although the appellee is badly deformed physically, her mind is about the average and she was fully capable of understanding that she was executing a deed.

The main question to be determined in this case is whether or not the appellant entered into a conspiracy to secure a deed to the property in question at less than its actual value, or whether or not he knew that the deed had been wrongfully obtained by Conley from appellee. The weight of the evidence establishes that the value of the property is from $500 to $700.

Appellee testifies that Conley and her husband continually threatened to shoot her with a high-powered

rifle and threatened to have her sent to the penitentiary for interfering with the United States mail unless she executed the deed to Conley. We have serious doubts as to the truth of this testimony, but we are convinced that Conley and her husband took advantage of appellee in order to obtain the execution of the deed to Conley. It appears from the evidence that appellee and her husband first went to a bank for the purpose of having a deed executed conveying the property from her to her husband, but were informed that this could not be done. Appellee and her husband came back to the bank the next day and a deed was executed to Conley. Appellant admits that the true consideration paid by him to Conley for the property was not $600 as recited in the deed, but was only $300. The obvious purpose of doing this was to enable appellant to negotiate the $300 lien note and pay Conley the $300 which he agreed to pay for the property. Appellant secured one T. L. Meek to purchase this lien note for $250 and paid this money to Conley, and it also appears that he gave Conley a check for $32 and credited him with $18 owing by Conley and Mullins to appellant.

After Conley obtained the deed from appellee, he made several efforts to sell the property to Harvey Williams, who owns, and lives in, property next door to appellee. Both Williams and his wife testify that the property was offered to them by Conley for $250 and a radio, and they state that just before the property was deeded to appellant, Conley told them that if they were not going to take it he was going to sell it to Chambers. Mrs. Williams also testifies that before Chambers secured his deed to the property, appellee told her they were going to sell and move to Russell.

At the time of the execution of the deed from Conley to Chambers, a writing signed by appellee and her husband was attached to the deed stating that appellee and her husband had deeded the property to Conley and that they gave him the right to sell the property and that the deed was made by them and that they were considered sound in mind and capable of looking after their own business. Counsel for appellee insists that this writing is a suspicious circumstance showing appellant's knowledge that something was wrong about the deed executed to Conley. Chambers, however, states that he knew nothing of this writing until the deed was made, and there is no evidence in the case indicating that he

did except the testimony of Conley given in his second deposition, to which we will shortly refer.

Very shortly after the execution of the deed from Conley to Chambers, Mullins abandoned appellee and left the community, and Conley and his wife moved out of appellee's house and settled at Wharton, West Virginia.

Appellant took Conley's deposition at Wharton, West Virginia, in June, 1936, and at that time Conley testified to the good faith of the transaction by which he obtained the deed from appellee, stating that Mullins owed him $520 and that the deed was executed to him by Mullins and his wife in satisfaction of that indebtedness. He testified positively at that time that Chambers was in no way concerned in securing the deed from appellee to Conley and that the execution of the deed by him to Chambers was a good faith transaction; that there was no conspiracy or agreement between him and Chambers with reference to the execution of either of the deeds in controversy.

Some time later, appellee's brother instituted a prosecution against Conley based on the alleged defrauding of appellee in the execution of the deed to Conley by her. He secured a warrant and in some manner brought Conley back to Johnson County from West Virginia pursuant to the warrant and Conley was placed in jail in default of bail. After he had been in jail some time, his deposition was retaken by appellee, and in this deposition he completely repudiated his former testimony, stating that there was a conspiracy between him, Chambers and Mullins to obtain the deed to Conley and eventually deed the property to appellant. In this latter deposition, he stated that the $250 paid him by Chambers for the property was turned over to Mullins by him and that he only received a radio and a small amount of money for his part in the transaction.

With the exception of this last deposition of Conley's, there is no evidence in the case that Chambers had anything to do with securing the deed from appellee to Conley or that he had any knowledge that the deed had been secured from her by coercion or by fraud. We are therefore confronted with determining whether or not the testimony given by Conley in his second deposition sufficiently establishes by a preponderance of the

evidence that Chambers had any guilty knowledge or connection with the wrongful obtention of the deed from appellee to Conley.

After careful consideration of the testimony of Conley in the second deposition and the circumstances and conditions under which it was given, we have come to the conclusion that the soundest course is to give no weight or consideration whatsoever to his testimony on either occasion. When he gave this second deposition he was laboring under the great stress of the threat of this criminal prosecution, and we are convinced that his change of front was brought about largely in his effort to appease appellee's brother and other parties who were behind the prosecution. He was evidently laboring under the impression that if he gave testimony satisfactory to those in charge of the prosecution, he would be released from custody or at least that the prosecution would not be vigorously pressed against him. As he testified both ways on the issue involved in the action and as his testimony on the second occasion does not bear such earmarks of truth that we feel justified in accepting it as true, to the exclusion of his former testimony. we feel that the only plausible course is to regard all testimony given by him in the case as utterly unreliable. When this is done, appellee has failed in establishing by any substantial evidence that appellant entered into any conspiracy to defraud her out of her property and secure the deed to it in the manner claimed by her. The deed to Conley had been executed by appellee approximately five weeks before Conley conveyed to Chambers. It seems unlikely that, if Chambers was in a conspiracy to obtain the property, he or the other parties would have waited such a length of time for the execution of the deed by Conley. During this interval appellee had every opportunity to complain to her brother or others if she desired to keep Conley from disposing of the property. She made no complaint to any one and, after the property was conveyed to Chambers, told him she would have been satisfied if she had gotten the money he paid Conley.

As we have above indicated, it appears that appellee was imposed on by a worthless and scheming husband cooperating with his friend, Conley, whose conduct in this case shows him to be a man of little or no character, but she has failed to meet the burden of establishing that appellant was a party to their scheme

or that he had knowledge of the fact that Conley had wrongfully and fraudulently obtained his deed from her.

The judgment is therefore reversed with directions to enter a judgment in conformity with this opinion.